

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00050-CR

THE STATE OF TEXAS                                              STATE

V.

MARLIN DERRELL YORK                                         APPELLEE

----------

## FROM THE 158TH DISTRICT COURT OF DENTON COUNTY

----------

### NO. 02-12-00051-CR

THE STATE OF TEXAS                                              STATE

V.

SHAVONIA TAMIKA YORK                                       APPELLEE

----------

## FROM THE 158TH DISTRICT COURT OF DENTON COUNTY

----------

## DISSENTING OPINION

----------

I must respectfully dissent from the majority's thoughtful opinion because I believe that the trial court correctly suppressed the evidence and that we should uphold the decision of the trial court.

The warrant was a no-knock search warrant, not an arrest warrant or a combination search-and-arrest warrant. Essentially, the affidavit supporting the warrant

1.  Correctly described the house that was clearly visible from the street;

2.  Stated that the affiant believed that something illegal was located in the house in violation of the health and safety code;

3.  Stated that the affiant believed that some money and other items were in the house;

4.  Stated that the person whom DPS records indicated was the resident of that house controlled the premises; and

5.  Stated that the affiant suspected that that person knowingly or intentionally possessed cocaine or other controlled substances.

The facts purporting to support probable cause were that

1.  The affiant had been a peace officer for seven years and two months and a member of the narcotics unit for three years and ten months and had gone to schools that taught "methods of investigating narcotics offenses, including the development of probable cause for the issuance of search warrants."

2.  On June 24, 2010, investigators with his police department were involved in a big methamphetamine and cocaine bust, during the search "investigators also found a cell phone inside the residence," and while they were still searching the house, "the cell phone received numerous phone calls. As the phone rang, Investigators could see the incoming number listed on the telephone as '972-966-9086.'"

3.    The affiant checked the number through "Accurint intelligence database," which returned the number to Marlin York with the address described in the affidavit and on his driver's license.

4.    "An inquiry into [Marlin] York revealed that he ha[d] lived at the suspected location since January 2008."

5.    On June 28, 2010, an unnamed fellow law enforcement investigator who was also conducting a drug-related investigation told the affiant that in February 2009, the unnamed law enforcement investigator had received information from an unstated source that Marlin York was "connected with individuals believed to be involved in the distribution of large amounts of illegal drugs."

6.    A month later, on July 21, 2010, the affiant drove to the Feathering Drive address and saw a gray Dodge Durango registered to Marlin York parked in the driveway.

7.    On July 23, 2010, the affiant and another investigator, Freeman, went to the suspected location and collected trash bags in the trash can "at the end of the driveway between the public sidewalk and the public street." They found a plastic bag with white powdery residue that field tested positive for cocaine, a single green leafy stem that field tested positive for marihuana, and mail in the name of Marlin York with the Feathering address.

8.    On August 17, 2010, the affiant saw a male who could have been Marlin York standing in the Feathering driveway next to the Dodge Durango registered to Marlin York.

9.    On August 20, 2010, the affiant went back to the Feathering address to collect trash and found

> 1.) Two large plastic bags that contained a white powder that field tested positive for cocaine.
>
> 2.) Multiple coffee filters that contained a white powder that field tested positive for cocaine.
>
> 3.) Mail in the name of Marlin York, with an address of 12625 Feathering Drive, Frisco, Texas.

3

10. The affiant concluded that "the size of the plastic bags and coffee filters that contained cocaine residue are indicators that Marlin York is a large volume cocaine dealer."

11. Marlin York's criminal history showed a prior Texas arrest for "Manufacture/Deliver a Controlled Substance Penalty Group 1 (4-200 Grams)" and two DWI arrests. It also showed a prior Louisiana arrest for "Possession With Intent to Distribute Cocaine, Armed Robbery, and Contempt of Court." The affidavit is silent as to convictions.

The trial court granted the motion to suppress and explained his reasoning:

1. The trash-runs were separated too far in time (July 23 and August 20).

2. The trial court did not believe a single trash-run was nearly sufficient.

3. There was no indication that the mail in Marlin York's name was found in the same trash bag as the trash with "the white powder coffee filters, the plastic bags, and that's just simply not sufficient to tie it directly, especially given that this is a trash-run and it's not an eyewitness eyeballing what occurred."

4. There was no indication that "all other reasonable means were exhausted prior to defaulting to a search warrant and the [S]tate needs to take all reasonable measures short of a search warrant to gather evidence prior to defaulting to such. And that's unreasonable."

5. The trash-runs were too remote in time one from the other and "it's just too attenuated."

6. The magistrate "could have and should have made a requirement on the face of the warrant requiring that it be executed within a reasonable period of time and instead defaulted to what the legislature has required" because drugs are quickly used and quickly sold. "It disappears quickly." The trial court concluded that there was too much time between the trash-run and the search and seizure.

7. Additionally, the trial judge expressed the following concerns: "And touching on the August 17th observations, so what?" The police

established that Marlin York either lived at that address or was visiting that address on that date. "It doesn't tie him to any sort of drugs, any sort of illegal activity." There was no recitation that the officers could not have employed other less-intrusive alternatives. No surveillance revealed that anyone observed any illegal activities. No recitation suggested any situation that made it unsafe for the officers to do anything "less intrusive than a search warrant."

I agree with the trial court. Although case law tells us that we look at what was contained within the four corners of the affidavit in a common-sense, not hypertechnical way, and admonishes us that rather than looking at what is missing from the affidavit or what should have been included in the affidavit, we must look to the four corners of the affidavit to determine if the magistrate could have inferred sufficient information to provide probable cause to support the warrant from the facts that were provided,[1] we should not attribute to the magistrate inferences that provide facts wholly missing from the affidavit.

If Marlin York was operating as a major drug dealer from the Feathering address, where in the affidavit is there any fact that supports that conclusion? A sixteen-month-old statement from an unnamed law enforcement investigator that he had received information from an unstated source that Marlin York was "connected with individuals believed to be involved in the distribution of large amounts of illegal drugs"? The fact that while unnamed officers were conducting a big drug bust, the cell phone of someone rang several times and someone saw Marlin York's telephone number as the source of one or more of the calls? We

---

[1]*Rodriguez v. State*, 232 S.W.3d 55, 61 n.25, 64 (Tex. Crim. App. 2007).

5

cannot tell, nor can we infer, whether a single call or multiple calls came from his phone. He was seen at most one time at the Feathering address, although the Dodge vehicle registered to him may have been there twice.

What was the evidence of drug dealing, direct or inferential? A single stem of marihuana found in a trash can on the curb in front of the Feathering address a month before the warrant issued and three plastic bags and coffee filters with cocaine residue? What was the evidence that the trash came from the house at the Feathering address? Mail addressed to Marlin York at the Feathering address was found in a trash bag. Could the magistrate reasonably infer that the mail was in the same bag as the residue? Could the magistrate reasonably infer that all the trash bags came from the house at the Feathering address?

We are instructed that we should uphold warrants if at all possible because otherwise the police would act without warrants and then seek to justify their search afterward.[2] Is that really what we think of our law enforcement officers? I may be naïve, but I believe our peace officers want to get it right. And we do them no favors by providing no guidance. We have rules. The Fourth Amendment to our Constitution guarantees that we shall be secure in our "persons, houses, papers, and effects, against unreasonable searches and seizures, . . . and no Warrants shall issue, but upon probable cause, supported

---

[2]*Ornelas v. United States*, 517 U.S. 690, 699, 116 S. Ct. 1657, 1663 (1996) (citing *Illinois v. Gates*, 462 U.S. 213, 236, 103 S. Ct. 2317, 2331 (1983)); *State v. Duarte*, 389 S.W.3d 349, 354 (Tex. Crim. App. 2012).

6

by Oath or affirmation . . . ."[3] Did someone bring the trash from the house or did someone bring the trash from another location and put it in the trashcan on the curb? We do not know, and neither does the magistrate or the affiant. Were people coming and going at the Feathering address? We do not know, and neither does the magistrate.

In *Flores v. State*, the Texas Court of Criminal Appeals upheld a similar warrant based on the "doctrine of chances."[4] Respectfully, search though I might, I have not been able to find any mention in the Constitution of the "doctrine of chances." Warrants must be based on probable cause. More significantly, the officers in *Flores* received an anonymous complaint of drug activity at an unnamed residence. "The concerned citizen also stated that he/she had observed a quantity of cocaine inside the residence in the past and that Child Protective Services had conducted an investigation (of) Flores regarding the use of marihuana in the presence of his children."[5] The citizen described the vehicles that would be at the house, and the police were able to corroborate the facts the informant had provided. The trash on the curb provided evidence confirming Flores's marihuana use.

---

[3]U.S. Const. amend. IV.

[4]319 S.W.3d 697, 703 (Tex. Crim. App. 2010).

[5]*Id.* at 699.

But nowhere in the affidavit involving Marlin York is there any mention that anyone saw contraband in the house on Feathering. Nowhere is there any mention that anyone bought any contraband through York, from York, at the Feathering address, or near the Feathering address. Nowhere in the affidavit is there any mention of any unusual activity at or near the Feathering address.

I would hold, as did the trial court, that from the four corners of the affidavit, the magistrate could not have inferred probable cause that the police would find evidence of drug trafficking inside the house at the Feathering address on the date the warrant was finally executed. Indeed, the officer waited from August 20, the day of the last trash run, until August 24 to execute the warrant. I would therefore uphold the trial court's suppression of the evidence against Marlin York.

Further, because the only evidence against Shavonia Tamika York (Marlin York's wife) was the evidence found as a result of the entry pursuant to the warrant that the trial court and I believe should not have been issued, the trial court also properly suppressed the evidence against her.

Because the majority does not uphold the trial court's decision in these two cases to suppress the evidence obtained pursuant to an unlawful warrant, I respectfully dissent.

LEE ANN DAUPHINOT
JUSTICE

PUBLISH

DELIVERED: May 9, 2013

8